SOLOMON B. STONG vs. WILKSON, BATES AND FIGHT.

1. A settlement made in a county court by an administrator, which is fraudulent in law, may be set aside by a court of chancery.

2. The securities of an administrator are liable for his misapplication of the rents and proceeds of the lands belonging to the estate.

3. An administrator is chargeable with interest upon uncollected notes bearing interest at the rate they bear, as well as upon money in his hands, and he should be credited by interest upon payments made by him.

4. Notes of an estate, executed to the administrator, which cannot be collected, and which are lost without his fault or negligence, should be credited to him with the accrued interest thereon, when he has been charged with the interest.

5. An administrator is not entitled to commission upon the assessed value of the slaves of the estate. He is entitled to a reasonable compensation for hiring them, &c.

Appeal from Jefferson Circuit Court.

BIRCH, J. delivered the opinion of the court.

David Stong died in 1835, leaving Anthony Wilkson the executor of his will and the guardian of his children. In October of that year, he was qualified as executor, but never as guardian. He continued in the executorship until the fall of 1844, when he was superseded by Skeil, who was also appointed guardian of the children then living. Wilkson made settlements annually, up to and including the April term of the court in 1842, at which time a balance was found against him in favor of the estate, amounting to $2364 94. At this settlement, although he had drawn the estate notes payable to him, with interest at the rate of ten per cent., the court seem to have charged him with but six, upon the annual balances which were found to have been in his hands. As this settlement, however, was neither appealed from, nor now impeached for any fraud, it may perhaps be found allowable and proper to permit it to stand as the basis of such subsequent calculations as their review may devolve upon us. To do so, however, it need scarcely be more specifically suggested, will be eminently liberal to the defendants, at the risk of at least possible injustice to the already long delayed and long wronged plaintiffs.

At the August term succeeding this settlement, the administration was allowed as credits for "boarding, clothing and washing" for the children

the aggregate sum of $807 66, and the additional sum of $40, for hiring out the slaves for the seven preceding years.  In June, 1840, Felix G. Hill was appointed guardian of the heirs, and continued so until his death, when Skiel was appointed as already stated.  At the April term of the county court in 1841, Wilkson was ordered to pay to Hill, for the use of each of the four heirs, $300; and at the August term in '42, he was in like manner ordered to pay $50 more to each heir, making an aggregate of $1400.  Neither of these orders having been complied with, a suit was commenced in the Jefferson circuit court in November, 1842, and a judgment obtained against the executor and his securities in May,1847, under an agreement which recited that as Wilkson had never finally settled up his executorship, he might establish such further credits as he was entitled to before the county court, and that whatever balance was thereby ascertained in his favor, should be available to him upon the judgment which might go in the circuit court.   It is set out in the record accordingly, that at the September term of the county court in 1847, a settlement was made, which being impeached for fraud in the bill which was subsequently brought to set it aside, and which is now before us on appeal, it will best promote a ready and correct understanding of the case throughout to here copy at large.

It is entitled "a final settlement," and is as follows :

Stong vs. Wilkson, Bates and Fight.

A. Wilkson, adm'r, in acc. with Solomon [David] Stong's estate.

| 1842. | Dr. | Cr. |
|---|---|---|
| Apr. 27, To balance on annual settlement,......... | 2363 94 | |
| Aug. 3, By amount allowances this term of court,. | | 847 66 |
| " Interest on same to this date,............ | | 254 00 |
| " Amount notes returned to Skeil, adm'r,.. | | 712 32 |
| Received by Skeil of McMullen,......... | | 7 40 |
| " " of Pully & Baker,.... | | 23 33 |
| " " of Perkins & Anderson, | | 16 10 |
| Paid Dr. S. Skeil, ..... .......... ... | | 6 50 |
| " Nancy Silvers,..................... | | 3 50 |
| " Mr. E. F. Laueier, .............. | | 8 00 |
| " Mrs. Vineyard, ...................-. | | 5 00 |
| " Collection,...............:.. .... | | 7 75 |
| " Costs, ..........................-..... ... | | 1 50 |
| " do,.............................. | | 1 25 |
| " Dr. McGready, ................... | | 20 00 |
| " Costs,.............. ............ | | 2 00 |
| Educating, board, clothing, &c., of S. B. Stong. | | |
| From Aug. 3, 1842, to 1846, ................ | | 200 00 |
| Board and funeral expenses P. B. Stong, ...... | | 40 00 |
| Education of Susan Stong, .... ............ | | 57 50 |
| " Mary Stong,.................... | | 67 50 |
| " A. Stong, ................. ....| | 93 75 |
| To amount note Cotesworth & Tucker | | |
| not collected,........ .......... .... | 149 00 | |
| Error in Jane Stong's account,.............. | 10 00 | |
| Amount note given T. H. Richardson,........ | 28 85 | 176 73 |
| Balance, ...... .. ... .................... | | |
| | $2551 79 | 2551 79 |

| 1847. | | |
|---|---|---|
| September term, balance due the estate,....... | $176 73 | |

As charged in the brief, it is apparent from the foregoing record of his final settlement, that the executor not only failed to state any interest account between himself and the estate, but also neglected to charge himself with either principal or interest accruing from the rent of farms and the hire of slaves during the years '42, '3 and 4,—the principal alone amounting to the aggregate sum of $820. The presumption of fraud legally attaching to such an omission as the latter, (passing by the items of interest in that connection) is too flagrant to be dispelled by the pretence in the answer, that in the fall of the latter year he handed over to his successor in the administration, certain notes due to the es-

tate, a portion of which only it found upon examination, were taken during the three years in question, and a portion previously, and the aggregate principal of all reaching but the sum of $519 50; whereas he actually procured a *credit* on this score for $712 32! Aware of the loose and immethodical manner in which the best intentional persons sometimes conduct such business as it becomes our duty thus to review, we have hypothetically given to the executor the benefit of every imaginable calculation of which the case seemed susceptible, in the hope of being able to excuse and thus to exonerate him from the effects of an apparently fraudulent neglect of the duties he had assumed; but as without a total disregard at once of figures, of facts, and of law, the attempt seems wholly impracticable, we are impelled to the conclusion that the chancery jurisdiction to which the new administrator and the heirs were in a measure *forced* to resort, should not have been denied them ( as it was ) by the dismissal of their bill.

The settlement, therefore, which we have copied, and upon which doubtless the defendant and his counsel successfully relied as a bar to this proceeding in the court below, must be set aside as having been fraudulent in law, if not fraudulent in design; and the jurisdiction of the entire case having thus attached to, and devolved upon this court, it must of course proceed according to the best lights evolved by the record, to ascertain as nearly as may be, the equitable state of the account between the parties, and render a decree accordingly.

It may be sufficient to premise, before reciting the substance of the answer, and the testimony of the defendant as to the allowances which he now claims, over and above those included in his alleged final settlement, that as the counsel of neither party seem to have bestowed any attention upon the point which respects and affirms the liability of the present securities, who (it cannot be legally doubted) *took the place* of the original ones in 1839, we suppose the untenableness of the adverse position, suggested and assumed in the separate answer of those securities (the new or present ones,) was regarded as being too apparent to justify remark or elaboration, and that it may consequently, in like manner, be passed over here. We are impressed, also, that a similar remark, particularly if made, in connexion with reference to the statutory duties of an administrator, will be sufficient upon the point of the securities exemption for the misapplication of the proceeds of land or farms.

To the bill of the complainants, ( who were the administrator and the two surviving heirs, ) the defendant, amongst other things not necessary to be further noticed, answered that if the settlement of 1847 was again opened, he protested against the original computation of the interest

upon the settlement of 1842, on the ground that interest was charged upon the amount found against him, at the first annual settlement, and upon the hires and rent of farms which was omitted to be charged in that settlement," and insists that the county court had "no right to charge interest upon the notes uncollected, but only upon the cash in hand "

It may be as well to state here as elsewhere, that the latter is a mistaken assumption. The notes of an estate uncollected, are drawing interest up to the time they are paid. When they *are* paid, the money thereby arising is either paid out to creditors or distributees, upon which disbursement counter and *equivalent* interest commences to run, so that under the proverbial indulgence of the county courts, as to the fractions or periods of time in which sums may casually lie in the hands of an administrator before it is seasonably convenient for him to see the persons to whom it is to be paid, (or sometimes necessarily lie so to abide the event of a pending suit or the like,) no loss can thus accrue to him. If the notes are even *never* paid, and it has not been from his neglect, they are counted to him on his final settlement (principal and interest) as so much money. We have, in short, examined and analyzed the record in respect to the combined complaints thus brought before us, and find nothing of which the *defendant* can complain respecting the settlement of 1842.

The defendant next alleges that in the settlement of 1847, he was, by mistake of the court, allowed but $40, instead of $70, for the hire of slaves for the years from 1835 to 1841, inclusive. We have examined the record transcript of the settlement he filed in August, 1842, to which he has referred in this behalf, and find that he is himself mistaken—that the *charge* is for $10 a year, ($70,) but that the allowance for the seven years is carried out in figures, $40. This sum being nearly $6 a year, we concur with the county court was at least enough for the simple job of hiring out four negroes to the highest bidder, and taking proper obligations. It happened to a member of this court, a few years ago, to be engaged in a similar administration, and he deemed the court of his county sufficiently liberal when allowing him $3 for every new-year's ride to town, and the hour or two expended in hiring out a few negroes.

In addition to, and exclusive of the credits allowed him by the county court, the defendant claims in his answer, that as for the year ending in October, 1838, one of the slaves was hired to Tarpley & Parker, for the sum of $71, and the money never collected by him, he should receive a credit for that sum on the ground (of course) that he has not been in

Stong vs. Wilkson, Bates and Fight.

such default as to render him strictly liable.   It appears from the trans-
cript of the justice, which is incorporated in the record, that the exe-
cutor instituted a suit and recovered a judgment against these parties,
in the county of St. Francois, between two and three years after the
note for this hiring fell due, and that he followed up this proceeding
with executions which were unavailing, the first one because no prop-
erty was found, and three subsequent ones because no sale could be
made for want of bidders.

Taking into view the distance between the county of the administra-
tion and the one in which the recovery of the debt had to be prosecu-
ted, and that property all the time remained in the hands of the
defendants, for which no bidders could be procured, we might be disin-
clined to visit upon him the consequences of an unqualified misfeasance
in that respect, and therefore allow him as a credit, the aggregate prin-
cipal and interest resulting from that item, did it anywhere appear in
the record, either positively or inferentially, that he had ever *charged*
himself, or been charged with that item of hiring.   The reverse, how-
ever, appearing to be the case, instead of charging him now with that
sum, and interest from the period of its accrual, as might well enough
be done under circumstances so nicely balanced, we will so far con-
tinue to respect the settlement of 1842, as to suppose that sufficient
reason was then apparent for not doing so, and but add in this connex-
ion, that such apparent disingenuousness as is betrayed in the attempt
to obtain credit for a sum with which he had been indulgently omitted
ever to be charged, cannot be otherwise than at least ill-considered,
except upon the assumption that the courts of the country will shrink
from the irksome, yet sworn duty, which is sometimes necessary to ana-
lyze and detect it.

There are claims to other credits set up in the answer, but as they
are covered by such a memorandum of admissions, made by the plain-
tiffs, they need not be further noticed until we reach that general
branch of the case.   We but add, therefore, in relation to the only re-
maining position assumed by the answer, that the claim for commission
on the assessed value of the slaves (which were divided by the heirs
themselves) is wholly inadmissible.

The commission, not exceeding six per cent., is allowed, in the dis-
cretion of the court, for the trouble and the risk of receiving and pay-
ing out money—including the risk of counterfeits, thefts and other
casualties, (to which may be added occasional extra losses, not previ-
ously estimated in the way of interest, as already alluded to)—whereas
no such service, nor indeed any other for which there may not be a pro-

per *specific* allowance, is even contingently involved in the division or partition of slaves.

Before entering upon the somewhat tiresome and uncertain calculations which yet lie before us, it may not be amiss to remark that infant heirs and distributees, as against administrators, curators or guardians, invoke not merely the most rigid and exact justice, but the most patient investigation of all the courts. To repeat nothing of their relation of wardship to our jurisprudence, for the services of administrations, the law makes not only an adequate but liberal average allowance, beyond which it is in contravention alike of justice, of reason, and of a positive and unyielding principle of law, that such trustees, more than any others, should in any manner, under any contrivance, be availed of a farthing which may have been, or ought to have been, produced by the administration of so sacred a trust fund. The nature of their appointment, and its acceptance, sufficiently implies that they will use and manage it all, and at all times, in the spirit of the law, for the benefit of those to whom it belongs; and if their accounts are either negligently kept or unperspicuously presented, whereby (as in this case) they may *suffer* in the attempt at legal adjustment, they have but themselves to blame. We are not without difficulty in attempting to reconcile the positions here assumed, with a recognition of the action of the county court in 1842, which charged the executor but 6 per cent. interest, whilst he was receiving, or ought to have been receiving, 10 per centum—that being then a lawful and even a ready interest. Perhaps it may have been estimated by the court that the other 4 per cent. should be allowed him for his trouble in annually loaning out the money, collecting the interest, &c., and it is therefore, not, however, without misgiving and hesitation, that we yield to the supposition that there may have existed reasons legitimately addressing themselves to the sound discretion of the court, which justified them in not carrying the interest higher than they did. Permitting therefore, the rate thus fixed to stand, both for and against the administrator, from that period to the present, and, from similar considerations of comity, forbearing further to review the settlement of 1847, than to supply the omissions already alluded to, and renew and carry forward the interest account theretofore established and raised between the parties, what yet remains of the case partakes mainly of simple arithmetical calculations based upon the only legal (however uncertain) rules, to which the state of the record permits application.

We have already seen that on the 27th day of April, 1842, there was found due to the estate, in principal and interest, the sum of $2,363 94.

After this period, the legal and most equitable rule is, to charge the executor interest upon the sum thus found in his hands, and other sums as they accrued to him, and to allow him interest upon such sums as he may disburse, from the date of such disbursement, respectively. Adhering, then, to the rate established by the court in 1842, the interest accruing upon the sum then due, up to the period of this decree would be about $1201. The sums which it is apparent he omitted to charge himself with, in the settlement so justly complained of, appear to be for rent of farms and hire of negroes, for the year ending October 19, 1842, $412; for the same, for the year ending on the 19th of October, 1843, $274; and for the same for the year expiring on the 19th day of October, 1844, $134—making an aggregate of $820—upon which the aggregate interest to the present period is found to be $361 18. To these several debits, there should be carried from the settlement of 1847, the two items last charged, amounting, with the interest thereon, to about $47—whereby it appears that the whole sum with which he is now chargeable, amounts to $4,813 12.

Turning next to the credit side of the account, assuming it to be true as alleged in the answer of the defendant, that the note of Colesworth and Tucker, with which he charges himself in the settlement of 1847, was part of the gross sum with which we have just charged him for negro hire, &c., in 1842, still, as there is no evidence in the record to exempt him from liability for his implied neglect in collecting it, the most that can be claimed in respect to that item is, that he be credited with the sum of $40 and the interest accruing upon that amount from the time it appears to have been received by his successor—say, altogether, $54 40. It will doubtless be appreciated, that whilst the dates of such of the items of credit as are dated at all, cover a range of several years, the dates of others can only be approximated by such equitable average as is suggested by the other dates, and by the facts and circumstances of the case. Whilst, therefore, as already suggested, this may possibly be the misfortune of the defendant, it cannot possibly be the fault of any other person, that we are left to subjoin the result of such calculations—running of course, as in the charges of interest against him, to the period of this decree. Upon the sum of $847 66, the amount allowed the defendant at the August term, 1842, the interest to this period would be about $414. Upon the amount of notes turned over to his successor, (being $519 50,) we have calculated the interest upon each from the time they respectively fell due, according to the inventory which forms a part of the record, and find the aggregate to be $249 44. For the sum paid for board, clothing and funeral expenses

for which the account which is filed furnishes no better dates to guide us than those recited in first and principal item, as running "from August 3d, 1842, to 1846,"₁ we can do no better (at least for the executor) than to assume the intermediate or average period, calculating from which, the aggregate interest accruing to this period would be $171 25. The interest which should be estimated upon the remaining small sums which were allowed at this settlement, calculated from the date of each voucher, where there is any, and from the uncertain, yet, only admissible date already alluded to, (except the extreme rule of the date of the settlement itself,) where there are no dates, is about $38. To these various items of interest, and the aggregate principal from which they are deduced, we think there should be allowed, under a liberal and fair construction of the agreement of counsel already alluded to, the aggregate sum of $197, together with $64 24, as interest thereon, making a total in that respect of $261 24. As we can scarce doubt that the educational and other expenses of raising the children, was even liberally covered by the final and apparently heavy allowances in 1847, we pass by the complaint of the answer in that respect, and therefore, as a last item, (probably overlooked in the settlement of '47,) we deem it reasonable that the executor should be allowed the sum of (say) $20, as principal and interest for hiring out the slaves during the years 1842, '43 and '44.

The aggregate sum, then, which was properly allowable as principal in the settlement of 1847, having been $1928 24, there remains but to add to it the various sums of interest heretofore found, as accruing upon the respective items of disbursement, and also the sum of $209 25, that being the sum produced by adding proper interest to the payment which seems to have been made by the executor under the settlement of 1847, together with $268 78, as his remaining commissions, and there is produced the sum total of the credits to which he is legitimately entitled. The aggregate of these being $3614 60, it follows that the decree here to be rendered must be for the sum of $1198 52. It need scarcely be more particularly stated that this conclusion has been reached as covering a full and final adjustment of all matters in contest between the parties, whether pertaining to the new administrator, or to the living, or to the deceased heirs—no reason having suggested itself why the claims against the latter might not be equitably included in a case where the living heirs can only inherit the slaves of the deceased, only subject to such demands as exist against them; and when, in short, it appears that the whole estate, of every nature, inures to the two living heirs for whose benefit this suit was instituted.

Let, therefore, a proper decree be entered accordingly.